JONATHAN STIEGLITZ
**LAW OFFICES OF JONATHAN A. STIEGLITZ**
11845 W. Olympic Boulevard, Suite 800
Los Angeles, California 90064
Telephone: (323) 979-2063
Facsimile: (323) 488-9748

EDWARD Y. KROUB
MOSHE O. BOROOSAN (*pro hac vice* forthcoming)
**COHEN & MIZRAHI LLP**
300 Cadman Plaza West, 12th Floor
Brooklyn, New York 11201
Telephone: (929) 575-4175
Facsimile: (929) 575-4195

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCISCO COLVIN,<br><br>                    Plaintiff,<br><br>        vs.<br><br>EQUIFAX INFORMATION SERVICES, LLC, and EXPERIAN INFORMATION SOLUTIONS, INC.,<br><br>                    Defendants. | Civil Action No.:<br><br><br>COMPLAINT FOR VIOLATIONS OF THE FAIR CREDIT REPORTING ACT<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Francisco Colvin ("Plaintiff"), brings this action on an individual basis under the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), seeking statutory and other damages against defendants Equifax Information Services, LLC ("Equifax") and Experian Information Solutions, Inc. ("Experian") (collectively, "Defendants") and alleges based upon Plaintiff's personal knowledge, the investigation of counsel, and information and belief, as follows:

**NATURE OF THE ACTION**

1.     Defendants Equifax and Experian have been assembling and selling consumer background reports (commonly called "credit reports") that falsely indicate that Plaintiff is deceased. Because financial institutions do not extend credit to deceased consumers, it is virtually impossible for Plaintiff to access credit.

2.     Defendants' erroneous reporting has already had serious consequences.  In November 2019, Plaintiff was involved in a car accident that caused significant damage to her personal vehicle, and that required Plaintiff to secure alternative means of transportation for the duration of the repair. When Plaintiff attempted to rent a car, however, he was informed that his credit report indicated that he was deceased, that he had no credit score, and that he would not be permitted to rent a car.

3.     Because he had no reliable means of transportation, ***Plaintiff missed an important appointment with a heart specialist to treat a medical condition involving blood clots.***

4.     Moreover, when Plaintiff finally applied for additional credit from a subsequent lender he was informed that his application was rejected because, *inter alia*, he was "[r]eported as deceased," and he had "[n]o credit file."

5.     Moreover, because Defendants reported that Plaintiff is deceased, they refused to generate a credit score for him.  Based on Plaintiff's understanding that financial institutions and other credit grantors could not process credit applications without a credit score – compounded with the fact that Plaintiff was mislabeled as deceased, his inability to rent a car, and the actual credit denial – Plaintiff's willingness to apply for additional credit was chilled

6.     Indeed, in February 2020, Plaintiff's car was stolen, and he was informed by the authorities that it was unlikely to be recovered.  Although he desperately needed a new car, Plaintiff

COMPLAINT FOR VIOLATIONS OF THE FAIR CREDIT REPORTING ACT

1  recognized that it would be futile to attempt to secure more credit, and chose not to even apply to

2  avoid the pain and humiliation of another rejection.

3      7.      Defendants' malfeasance has also subjected Plaintiff to the heightened risk of identity

4  theft; identity thieves tend to seek out credit files of deceased individuals to commit fraud.

5      8.      Moreover, insofar as Defendants purportedly believed that Plaintiff was deceased, they

6  had no legally permissible basis for selling his consumer credit reports.

7      9.      Accordingly, and as alleged herein, Defendants have violated Plaintiff's rights under

8  the FCRA.

9                                    **PARTIES**

10     10.     Plaintiff is a resident of Los Angeles County, California, and qualifies as a "consumer"

11  as defined and protected by the FCRA.  *See* 15 U.S.C. § 1681a(c).  Plaintiff is an individual (and not

12  an entity).

13     11.     Defendant Equifax is a consumer reporting agency that regularly conducts business in

14  this judicial district.  Equifax has a principal place of business located at 1550 Peachtree Street, NW,

15  Atlanta, Georgia 30309, is registered to do business in the State of New York, and may be served

16  with process upon The Corporation Service Company, its registered agent for service of process at

17  80 State Street, Albany, New York, 12207.  Equifax is a subsidiary of Equifax, Inc.  Equifax qualifies

18  as a "consumer reporting agency" under 15 U.S.C. § 1681a(f), and, by contractual agreement,

19  disbursed consumer background reports for remuneration to third parties.

20     12.     Defendant Experian is a consumer reporting agency that regularly conducts business

21  in this judicial district.  Experian has a principal place of business located at 475 Anton Boulevard,

22  Costa Mesa, California 92626, is registered to do business in the State of New York, and may be

23  served with process upon CT Corporation, its registered agent for service of process at 111 8th

24  Avenue, New York, New York, 10011.  Defendant qualifies as a "consumer reporting agency" under

25  15 U.S.C. § 1681a(f), and, by contractual agreement, disbursed Plaintiff's consumer background

26  reports for remuneration to third parties.

27

28

COMPLAINT FOR VIOLATIONS OF THE FAIR CREDIT REPORTING ACT

**JURISDICTION AND VENUE**

13.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and pursuant to 15 U.S.C. § 1681p, which states that "[a]n action to enforce any liability created under this title may be brought in any appropriate United States district court, without regard to the amount in controversy[.]"

14.    Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Plaintiff resides in this District and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

**SUBSTANTIVE ALLEGATIONS**

**The FCRA**

15.    The FCRA is a federal statute designed to protect consumers from the harmful effects of inaccurate information contained their consumer credit reports.  Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA, as follows:

> (1) The banking system is dependent upon fair *and accurate* credit reporting. ***Inaccurate credit reports directly impair the efficiency of the banking system***, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

> (2) An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

> (3) Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

> (4) There is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. §1681(a) (emphasis added).

- 3 -

COMPLAINT FOR VIOLATIONS OF THE FAIR CREDIT REPORTING ACT

16.    To achieve these goals, the FCRA mandates consumer reporting agencies to adhere to the following twin duties: (i) to assure maximum possible accuracy of information when preparing consumer reports and to set up reasonable procedures to maintain compliance with this minimum reporting standard; and (ii) to reinvestigate the facts and circumstances surrounding a dispute by consumers and to appropriately and timely correct any inaccuracies, including by quickly notifying the furnisher and any other parties in the distribution chain of the disputed inaccuracies.

**Substantive Allegations**

17.    Plaintiff has been marked as "deceased" on his Equifax and Experian credit reports for an unknown length of time but at least since November 2019.

18.    Plaintiff is not deceased.

19.    Defendants did not calculate or provide any credit score on or about Plaintiff, but still sold reports to end users indicating that he was deceased.

20.    Before selling these misleading consumer reports, Defendants did not conduct any investigation to verify that the information it had received was accurate.

21.    Defendants continue to publish and disseminate this inaccurate credit information regarding Plaintiff to third parties, including financial institutions and other credit grantors. Defendants have repeatedly disseminated consumer reports to third parties since at least November 2019, and continue to do so.

22.    This has frustrated, if not completely precluded, Plaintiff's efforts to obtain credit.

**Plaintiff Is Denied Credit Because of The Deceased Notation**

23.    In February 2020, Plaintiff applied for credit from the Pentagon Federal Credit Union ("PenFed").   By letter dated February 17, 2020, PenFed denied Plaintiff's application, stating, in pertinent part, as follows:

> Thank you for your recent application for credit.  We have carefully considered your request, but were unable to approve it due to the following reason(s):
>
> - Insufficient credit history
> - We do not grant credit to any applicant on the terms you requested.

COMPLAINT FOR VIOLATIONS OF THE FAIR CREDIT REPORTING ACT

- • ***Reported as deceased.***

(emphasis added).

24.    The February 17, 2020 PenFed denial letter explicitly stated that its decision "was based in whole or in part on information obtained in a report from . . . Equifax[.]"

25.    Plaintiff also applied for credit from U.S. Bank, but was denied.  By letter dated February 21, 2020, U.S. Bank informed Plaintiff that his application was denied because "[y]our credit bureau did not contain a numerical score," stating, in pertinent part, as follows:

> Thank you for applying for a U.S. Bank Signature Rewards Credit Card account.
>
> We regret we are unable to approve your application at this time.
>
> In evaluation your request for credit, we base our decision on a numerical score (also known as a credit score) provided by the credit bureau.  ***Your credit bureau did not contain a numerical score because of one of the following reasons: No credit file***; limited credit experience; or insufficient recent credit experience. Please call our office for further clarification.

(emphasis added).

26.    The February 21, 2020 U.S. Bank denial explicitly stated that its "decision was based in whole or in part on information obtained from . . . Experian[.]"

**<u>Hertz Denies Plaintiff's Application to Rent A Car</u>**

27.    Furthermore, in or about November 2019, was involved in a car accident that caused significant damage to his personal vehicle.  Plaintiff's insurance had lapsed, unfortunately, and would not cover the cost of a rental vehicle for the duration of the repairs.

28.    Plaintiff attempted to rent a car from Hertz, and, as part of the rental application process, authorized Hertz to run a background check.

29.    Hertz obtained a credit report prepared by Equifax, learned that Plaintiff was reported as deceased, and denied his application.

30.    Plaintiff was left without any means of transportation for over a month.  He thus had to rely on friends, family, and public transportation to get to work.  These modes of transportation

1   were unreliable, and cause Plaintiff to be late to work on several occasions, prompting comments and

2   inquiries from his boss.

3       31.     And because he had no reliable means of transportation, Plaintiff was unable to attend

4   a scheduled appointment with a cardiologist to treat a heart condition involving blood clots.

5                 **Plaintiff is Chilled From Applying for Auto Financing After His Car Was Stolen**

6       32.     In February 2020, Plaintiff's car was stolen.  The authorities informed Plaintiff that it

7   was unlikely that his car would ever be recovered.

8       33.     Although he desperately an auto financing loan to purchase a new vehicle, he was

9   afraid to apply credit because of the inaccurate "deceased" notation on his credit report.

10      34.     As of the filing of this action, Plaintiff has still not purchased a new vehicle.

11      35.     As a result of Defendants' conduct, Plaintiff has suffered actual damages in the form

12  of loss of credit opportunity and credit defamation.  Defendants' conduct has also chilled Plaintiff's

13  willingness to apply for additional credit.  Finally, Defendants' conduct has caused Plaintiff to suffer

14  emotional distress, including anxiety, frustration, embarrassment, and humiliation.

15  **Defendants' Misconduct is Part of a Pattern and Practice of Preparing Consumer Credit**
16  **Reports in Derogation of its Statutory Obligation to Ensure Maximum Possible Accuracy**

17      36.     Defendants are regulated as "consumer reporting agencies" under the FCRA.  *See* 15
18  U.S.C. § 1681a(e).

19      37.     Defendants sell millions of consumer reports (often called "credit reports" or
20  "reports") per day, and Defendants also sell credit scores.  *See* 15 U.S.C. § 1681a(e).

21      38.     Pursuant to the FCRA, Defendants must follow procedures which ensure that the
22  reports they sell meet the standard of "maximum possible accuracy."  15 U.S.C. § 1681e(b).

23      39.     Pursuant to the FCRA, Defendants must maintain reasonable procedures to assure that
24  reports are sold only for legitimate "permissible purposes." 15 U.S.C. §§ 1681e(a) & 1681b.

25      40.     Defendants place a "deceased" notation or marking on reports when they are advised
26  from any of their many data furnishing sources that a given consumer is deceased.

27

28

COMPLAINT FOR VIOLATIONS OF THE FAIR CREDIT REPORTING ACT

41. The furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" code in the ECOA field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

42. Defendants do not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark on that consumer's report.

43. Defendants do not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

44. Defendants do not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

45. Defendants send letters and/or other communications on occasion to consumers to verify certain information that may be considered suspicious or unreliable before placing that information in the consumer's credit file. For example, that procedure is sometimes triggered when a consumer's credit report contains a freeze or fraud alert, or as required certain applicable state consumer protection law. But Defendants have no similar procedure to notify the consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" deceased code is furnished to Defendants to be placed in a consumer's credit file or report.

46. Defendants regularly receives the "Death Master File" from the Social Security Administration listing by social security number those consumers that the government believes to be deceased. But Defendants do not cross-reference the "X" code received from furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

47. Defendants will only use the Death Master File to sell additional products for an additional fee which are designed to show whether a given consumer is truly deceased.

COMPLAINT FOR VIOLATIONS OF THE FAIR CREDIT REPORTING ACT

48.    Indeed, Defendants employ no procedures *at all* to verify that a consumer is in fact deceased before placing the "deceased" mark on that consumer's report and selling that report.

49.    Defendants have no procedures to verify that a consumer is alive even if other data contained in the consumer's report indicates that the consumer is still alive.

50.    Once a "deceased" mark is placed upon a consumer's report, Defendants will not calculate and will not provide a credit score for that consumer.

51.    Nevertheless, Defendants routinely sell to third parties credit reports for persons with a "deceased" mark on their reports with no credit score, despite a request by the purchaser of the report for a credit score for that consumer.

52.    Defendants never calculate or provide a credit score for a consumer that is marked as "deceased" on a credit report.

53.    Defendants know that third party credit issuers use a credit score in order to process a given credit application.

54.    Defendants know that many third-party credit issuers require a credit score in order to process a given credit application.

55.    Defendants know that consumers without credit scores are unable to secure any credit from most credit issuers.

56.    Defendants know that living consumers are turned down for credit specifically because Defendants are reporting them as "deceased" and without a credit score.

57.    Defendants have been put on notice for years through consumer disputes and lawsuits that living consumers are turned down for credit specifically because Defendants are reporting them as "deceased" and without a credit score.

58.    Defendants have received and documented thousands of disputes from consumers alleging that consumer credit reports assembled and sold by Defendants erroneously marked them as "deceased."

COMPLAINT FOR VIOLATIONS OF THE FAIR CREDIT REPORTING ACT

59.     Defendants know that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" code, but said consumers are not on the Death Master File and are, in fact, alive.

60.     Nevertheless, Defendants employ no procedures which assure that consumers marked as "deceased" by Defendants' reports are, in fact, deceased.

61.     Even consumers who dispute the incorrect "deceased" designation on their credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

62.     Defendants have no independent procedure to change an erroneous deceased status on their own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, which reinvestigation was triggered by a consumer dispute.

63.     Nor do Defendants employ any procedures to limit or stop the furnishing of reports to third parties for consumers which it has marked as "deceased" under any circumstances.

64.     For years after a consumer's actual death, Defendants will continue to sell credit reports about that consumer.

65.     Defendants will only remove a deceased consumer's file from their credit reporting database when end user stop purchasing those credit reports, and the financial incentive to continue selling those reports is terminated.

66.     Defendants charge third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

67.     Defendants profit from the sale of reports on the deceased.

68.     Defendants' credit reporting databases contain hundreds of thousands of "deceased" tradelines corresponding to distinct credit files for individual consumers that have been marked "deceased."

69.     Defendants know that truly deceased consumers do not apply for credit.

COMPLAINT FOR VIOLATIONS OF THE FAIR CREDIT REPORTING ACT

70.     Defendants know that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud.  Indeed, it is common knowledge in the credit reporting industry that the identity thieves actively seek out the personal identifying information of deceased consumers.  This type of identity theft and credit fraud is rampant, and poses a serious threat to consumers erroneously reported to be deceased.

71.     Defendants warn the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased, and requires relatives to provide a death certificate or executorship papers, among other proofs, before accessing the deceased consumer's credit information or report.

72.     Defendants have no similar death certificate, executorship paper, or any other proof requirements for their data sources which report a consumer as deceased or for the buyers of their reports which access the purportedly deceased consumer's information.

73.     Indeed, Defendants sell reports on the deceased to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

74.     There is no legally permissible purpose for Defendants to ever sell the credit reports of deceased consumers, absent a court order.

75.     Defendants know that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, and that this information can be used to commit identity theft or for other fraudulent purposes.

## FIRST CAUSE OF ACTION

### Violations of 15 U.S.C. §1681e(b)

76.     Plaintiff repeats and realleges the above allegations as if set forth in full herein.

77.     The FCRA imposes a duty on credit reporting agencies to devise and implement procedure to assure the "maximum possible accuracy" of the information contained in consumer credit reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure **maximum possible**

1

**accuracy** of the information concerning the individual about whom
the report relates.

2

15 U.S.C. § 1681e(b) (emphasis added).

3

78.    In violation of §§ 1681e(b), Defendants failed to follow reasonable procedures to

4

ensure maximum possible accuracy of the information attributable to Plaintiff, by reporting inaccurate

5

information in Plaintiff's consumer background reports.

6

79.    In violation of § 1681o and § 1681n, Defendants' conduct was a direct and proximate

7

cause of Plaintiff's injury.  Defendants are therefore liable to Plaintiff for their negligent and willful

8

failures to follow reasonable policies and procedures.

9

80.    As a result of Defendants' violations of 15 U.S.C. §§ 1681e(b) and 1681i, Plaintiff

10

suffered statutory and actual damages as described herein and is entitled to recover actual damages

11

and punitive damages, pursuant to 15 U.S.C. §§ 1681n and 1681o.

12

**PRAYER FOR RELIEF**

13

**WHEREFORE**, Plaintiff demands a judgment:

14

1.    Awarding Plaintiff monetary damages, actual damages, and punitive damages,

15

including pre-judgment and post-judgment interest;

16

2.    Awarding attorney's fees, costs, and expenses, and

17

3.    Awarding such other relief as this Court may deem just and proper.

18

**JURY DEMAND**

19

Plaintiff hereby demands a trial by jury.

20

Dated: March 19, 2020                 Respectfully Submitted,

21

**LAW OFFICES OF JONATHAN A. STIEGLITZ**
JONATHAN STIEGLITZ

22

23

*/s/ Jonathan A. Stieglitz*
JONATHAN A. STIEGLITZ

24

25

11845 W. Olympic Boulevard, Suite 800
Los Angeles, California 90064
Telephone: (323) 979-2063
Facsimile: (323) 488-9748

26

27

28

- 11 -

COMPLAINT FOR VIOLATIONS OF THE FAIR CREDIT REPORTING ACT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COHEN & MIZRAHI LLP**
EDWARD Y. KROUB
MOSHE O. BOROOSAN (*pro hac vice* forthcoming)
300 Cadman Plaza West, 12th Floor
Brooklyn, New York 11201
Telephone: (929) 575-4175
Facsimile: (929) 575-4195


*Attorneys for Plaintiff*

---

- 12 -

COMPLAINT FOR VIOLATIONS OF THE FAIR CREDIT REPORTING ACT